Syllabus.

# Richmond.

## Alonzo Peoples v. Commonwealth.

### March 17, 1927.

1. Appeal and Error—*New Trial—Reversal—Section 6363 of the Code of 1919.*—Under Code 1919, section 6363, the Supreme Court of Appeals is inhibited from setting aside a verdict approved by the trial court unless it appears from the evidence that such judgment is plainly wrong and without evidence to support it.

2. Homicide—*Evidence Sufficient to Sustain Verdict of Murder in the First Degree.*—In the instant case, a prosecution for homicide, a witness testified that she saw accused jump out of his automobile from the side nearest to the deceased, and that he had something in his hand that looked like an automobile crank, and that he went toward deceased and that witness heard a report of a pistol and saw a puff of smoke near the deceased. She then saw the accused go to an apple tree about forty feet from deceased and put down what he had in his hand. Another witness testified that defendant told him that deceased shot herself with a 32-20 pistol. This witness introduced a 32-20 bullet which he said was given to him by the undertaker as having been taken from the body of deceased. The witness said that he went to a room in the house of the mother of deceased and found a coat which he thought would fit accused, from the pocket of which he took an empty 32-20 pistol shell. Defendant's mother testified that she heard the shot from her house and went out and saw deceased crumpled up and that accused was coming toward the deceased but did not have a pistol. On the trial the accused asserted the defense that the pistol wound was self inflicted, and introduced a witness who testified that deceased said that she meant to kill herself before day. This witness, however, was contradicted by evidence for defendant. Deceased's life was insured in favor of defendant. The pistol was never found.

    *Held:* That the evidence was sufficient to support a verdict of guilty.

3. Appeal and Error—*Order of Proof—Discretion of Court.*—The order in which evidence is introduced is a matter which rests in the sound discretion of the trial court, and the exercise of this discretion will not be interfered with, unless there has been a palpable abuse of same. Especially is this true where proof of a crime depends in part, or in whole, upon circumstantial evidence.

Syllabus.

4. HOMICIDE—*Evidence—Connection of Accused with Pistol Shell and Coat Introduced—Case at Bar.*—In the instant case, a prosecution for murder, accused objected to the introduction in evidence of a coat and empty pistol shell found in a room in the house of the mother of accused, on the ground that these articles were not sufficiently identified before their introduction to connect the accused with them.

   *Held:* That the burden of proof rested upon the Commonwealth to connect the accused with the coat and the empty shell.

5. HOMICIDE—*Evidence—Connection of Accused with Pistol Shell and Coat Introduced—Case at Bar.*—In the instant case, a prosecution for murder, accused objected to the introduction of an empty pistol shell and coat in evidence on the ground that they had not been sufficiently identified to connect accused with them. Accused had free access to the room in which these articles were found. The coat, according to the testimony of a witness "would about fit the accused." Accused was present when deceased was killed. A bullet that would fit the empty shell was removed from the body of deceased.

   *Held:* That the accused was sufficiently connected with the coat and shell to admit of their introduction as evidence, especially as accused did not deny that the coat belonged to him and made no effort to explain the presence of the shell in the coat.

6. TRIAL—*Technicalities—Circumstantial Evidence.*—It is the present policy of the courts to strip a case as far as possible of technicalities and reach a just solution upon the merits; especially is this true in cases involving circumstantial evidence.

7. CIRCUMSTANTIAL EVIDENCE—*Admissibility.*—Much must be left to the discretion of the trial judge, but where the proper determination of a fact depends upon circumstantial evidence, the safe, practical rule to follow is that in no case is evidence to be excluded of facts or circumstances connected with the principal transaction, from which an inference can be reasonably drawn as to the truth of a disputed fact. While a single circumstance, standing alone, may appear to be entirely immaterial or irrelevant, it frequently happens that the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.

8. HOMICIDE—*Argument of Counsel—Demonstration by Commonwealth's Attorney that Deceased could not have Committed Suicide—Case at Bar.*—In the instant case, the Commonwealth's attorney borrowed a long-barreled revolver from an officer and started to demonstrate that it was impossible for the deceased to have shot herself, over the protest of the attorney for accused. There was no evidence that the revolver used by the Commonwealth's attorney was the one by which deceased was shot, but there was evidence that the pistol

used for the demonstration was of the same calibre, size and kind
as that formerly owned by the deceased. The attorney for the
Commonwealth was not seeking to demonstrate that deceased was
shot with a pistol similar to the one he was using by way of illus-
tration, but was endeavoring to show that it was impossible for the
deceased to have shot herself with a pistol of the same calibre, size
and kind as the one exhibited.

*Held:* That the court did not err in refusing to sustain the objection
of accused to the action of the Commonwealth's attorney.

9. ARGUMENT OF COUNSEL—*Illustrations—Appeal and Error.*—Argument
by means of illustration, such as exhibiting to the jury models, tools,
weapons, implements, etc., is a matter of every day practice. A
discretion is vested in the trial court to prevent an abuse of the use
of such illustrations, and unless there has been such an abuse, the
appellate court will not interfere.

10. CRIMINAL LAW—*Reasonable Doubt—Each Juror Convinced Beyond a
Reasonable Doubt.*—In a prosecution for homicide, the court refused
to give the following instruction for the accused: "Each juror
should feel the responsibility resting upon him as a member of the
jury, and should realize that his own mind must be convinced beyond
a reasonable doubt of the defendant's guilt before he can consent to
a verdict of guilty. Therefore, if any individual member of the jury,
after having duly considered all the evidence in this case, and after
consultation with his fellow jurors, should entertain a reasonable
doubt of the defendant's guilt, it is his duty not to surrender his own
convictions, simply because the balance of the jury entertain differ-
ent convictions."

*Held:* Upon the authority of *Sims* v. *Commonwealth*, 134 Va. 736, 115
S. E. 382, and *Scott* v. *Commonwealth*, 143 Va. 510, 129 S. E. 360, that
it was not error to refuse the instruction.

11. HOMICIDE—*Motive—Instructions—Instruction not Supported by the Evi-
dence—Case at Bar.*—In a prosecution for homicide, the court refused
to instruct the jury that the absence of all evidence of an inducing
cause or motive to commit the crime, when the fact is in reasonable
doubt as to who committed it, afford a strong presumption of in-
nocence.

*Held:* That while the instruction stated a correct principle of law, it
was not applicable to the case at bar where there was evidence of an
eyewitness, which pointed to the accused as the perpetrator of the
crime, and evidence that the life of deceased was insured for the
benefit of defendant which, according to the theory of the Common-
wealth, constituted a motive for the killing.

12. HOMICIDE—*Circumstantial Evidence—Instructions—Amendment by Court
—Case at Bar.*—In the instant case the accused asked that the jury
be instructed that "circumstantial evidence must always be scanned

with great caution, and will never justify a verdict of guilt, especially of an offense, the penalty of which may be death, unless the circumstances proven are of such a character and tendency as to produce on a fair and unprejudiced mind, a moral conviction of the guilt of the accused beyond all reasonable doubt, and unless the jury believe from the evidence that each and every circumstance essential to conviction of the accused had been made out and established beyond a reasonable doubt, then the accused should be acquitted." The court amended the instruction by inserting the words "as well as all evidence" after the words "circumstantial evidence."

*Held:* That while it was doubtful whether or not the instruction, either as offered or as amended, should have been given, there was no error in the court telling the jury to scan *all* the evidence with great caution and refuse to bring in a verdict of guilty unless satisfied beyond a reasonable doubt of the truth of the charge.

Error to a judgment of the Circuit Court of Norfolk county.

*Affirmed.*

The opinion states the case.

*R. H. Bagby* and *T. E. Gilman*, for the plaintiff in error.

*John R. Saunders, Attorney General, Leon M. Bazile* and *Lewis H. Machen, Assistant Attorneys General*, for the Commonwealth.

CAMPBELL, J., delivered the opinion of the court.

The accused, Alonzo Peoples, has been convicted by a jury of murder in the first degree, and sentenced to confinement in the penitentiary for a period of twenty years.

The record, while unsatisfactory, displays the following facts:

Lena White, a negro woman, on the 13th day of September, 1925, about six o'clock a. m., came to her

death as a result of a wound inflicted by a bullet from a 32-20 calibre pistol; the bullet entered under the right arm near the back, at a point on the right side of her body, in the lower border of the liver, and came out on the left side of the body at a point about two inches higher than the point of entrance. The deceased lived in the home of Mary Manson, who was the mother of the accused. The accused lived in the home of Sallie Beard, situated a mile distant from the home of Mary Manson.

That the accused and the deceased were on friendly, if not intimate, terms, is evidenced by the fact that the life of the deceased was insured for the benefit of the accused, in the aggregate sum of $550, and the premiums on the policies were sometimes paid by the accused.

Mary Williams, a witness for the Commonwealth, stated that on the morning of the tragedy the deceased was leaning against a fence which surrounded the yard of Mary Manson; that the accused was in his automobile, which was parked a short distance from where the deceased was standing; that the accused suddenly jumped out of his automobile, from the side nearest to the deceased, and that he had something in his hand which looked like an automobile crank; that he went toward the deceased; that she heard the report of a pistol and saw a puff of smoke near or at the deceased; then she saw the accused go to an apple tree about forty feet distant from the deceased and put down what he had in his hand; that he then came back and put the deceased in his automobile and carried her away; that she was too far away from the parties to hear anything that was said.

George C. Smith, deputy sheriff of Norfolk county, testified that he went to Alonzo Peoples' mother's home

at about ten a. m. on the morning of the homicide and arrested the accused, Alonzo Peoples, and that the accused told him that Lena White shot herself with a 32-20 pistol in front of Mary Manson's house; that he didn't see her do it, as he was in a stooping position, working on his automobile; that there was no one present except him and Lena and possibly Mary Manson and her husband, who were in the house; and that he immediately put Lena White in his automobile and carried her to the Naval Hospital, and was directed there to go to the King's Daughters Hospital, where he went. Smith introduced a bullet and said it was a 32-20, given to him by the undertaker who prepared Lena White's body for burial. Smith further testified that he went to the room at Mary Manson's without a warrant; that the room was, from appearances, used by both a man and a woman, and that he found a coat which he thought would about fit the accused, and in the pocket of the coat an empty 32-20 pistol shell. He testified further that in this room he found several insurance policies in which Lena White was the assured and Alonzo Peoples was the beneficiary.

Frank Wilson, State prohibition officer, testified that he had measured the distance from the point where Lena White was standing at Mary Manson's house, and from that point to the point on the porch where Mary Williams was standing, it was 450 feet; that the big gate was a few feet further away and there was no obstruction between the two points; that he saw Peoples take some papers out of the top of Peoples' automobile and take them into Mary Manson's house, and that he (Wilson) followed Peoples into the house and found the papers, among which were the insurance policies which were introduced, in a pitcher of water.

Mary Manson, introduced as a Commonwealth's

witness, stated, in substance, that she was in the house when she heard the report of the pistol; that she went out in front of her house where she saw the deceased "crumpled down;" that the accused was coming towards the deceased from the left side of the car and that he did not have a pistol; that she assisted in putting the deceased in the automobile; that the deceased owned a pistol; that the deceased left her house before night on Saturday and did not return until the next morning.

On the trial the accused asserted the defense that the pistol wound which caused the death of the deceased was self-inflicted. To substantiate this defense the accused introduced one John Giles, who testified that he peddles fish from a truck, and was at Mary Manson's house for that purpose late Saturday, between eight and nine o'clock, before the shooting which occurred the following morning, and that Lena White was there, as she lived there, and in conversation with her, she said: "I mean to kill myself before day."

The accused, testifying in his own behalf, said that he lived at Sallie Beard's house, about one mile distant from the house of Mary Manson, his mother, and that Lena White lived at Mary Manson's house; that he, together with Lena White, "Arkansas" High and Rube Wilson, went to Portsmouth at about eight o'clock on Saturday evening preceding the morning of the homicide; that after getting to town he, alone, between nine and ten o'clock, ate supper at a "yoca-a-min" shop; that later on, about half past ten, he, together with Lena White and the other two who had accompanied him, left Portsmouth in his automobile for their homes; that he, Peoples, got home about eleven-thirty or twelve o'clock; that he ate his supper and went to bed. The next morning about four o'clock he got up and drove in his car on the Bower Hill road; that he saw

Lena on this road at about five o'clock in the morning, about one hundred yards from the Goodman Lane, and carried her in his car to the house of Mary Manson; that Lena went into the yard; that he, Peoples, got out and worked on the car; that Lena was at the big gate in front of the car, to the right; that he had his head down and heard the report of a gun, and that he and his mother, Mary Manson, got to her about the same time; that he, Peoples, then took her in his car first to the Naval Hospital and then to the King's Daughters Hospital, and then to the undertaker's shop, after which he reported the homicide at the county jail, to Mr. Meiggs, the jailor. He stated further that he did not shoot Lena, that he did not have a pistol with him, and that Lena had had a 32-20 pistol for two weeks, which was the property of one Willie Fields, held by the said Lena as a pawn; that Lena White shot herself, but that he did not get the pistol with which she was shot; that he had not seen the pistol since; that, upon his return to Mary Manson's house, after having been to the jail and having reported the matter, Mr. Powell and other officers and other people were on the premises. He further stated that he had had no altercation or difficulty with Lena; that he and Lena were good friends; that he knew of no reason why Lena should have shot herself, but he had heard her say that she was going to kill herself.

[1] The first assignment of error relates to the action of the trial court in refusing to set aside the verdict of the jury as being contrary to the law and the evidence.

In *Walker* v. *Commonwealth*, 132 Va. 595, 110 S. E. 253, Judge Prentis said: "Under Code 1919, section 6363, this court is inhibited from setting aside a verdict approved by the trial court unless it appears from the evidence that such judgment is plainly wrong and with-

out evidence to support it. To reverse these convictions would be to disregard the statute."

This being the law, established both by enactment and decision, the case of the accused stands in this court practically as on a demurrer to the evidence.

There is no disputing the fact that the death of the deceased resulted from the bullet wound, and that the calibre of the bullet was a 32-20.

It was the theory of the Commonwealth that the motive which actuated the killing was the collection of the life insurance policies held by the deceased, in which the accused was the named beneficiary. That the accused was the custodian of the life insurance policies is established by the evidence of the witness, Wilson, who saw the accused take some papers out of the top of the automobile and then followed the accused into the Manson home and found the policies among the papers in a water pitcher.

The accused, while testifying as a witness in his own behalf, did not refer to the insurance policies. While it is true that the accused gave the jury the benefit of his evidence that Lena White shot herself, the jury also had the contradictory statement of the accused, made to Meiggs, the deputy sheriff, that "Lena White was dead, that she had been shot, but he didn't know how   *   *."

No explanation is made by the accused why, according to the evidence of Mary Williams, he left a dying woman and walked forty feet to an apple tree and secreted whatever it was that she saw in his hand. Nor, when testifying in his own behalf, did he deny that the coat introduced by the witness, Smith, was his coat, nor did he offer any explanation of the 32-20 empty shell found therein.

The finding of this 32-20 empty shell was a pregnant circumstance connecting the accused with the death of

Lena White. This circumstance, when contrasted with the circumstance that the pistol has never been produced, must inevitably have impressed the jury. The disappearance of the pistol is certainly a most significant incident from which the jury were warranted in drawing the inference that some one must have had a motive in concealing the pistol.

Another very significant matter is the contradiction of the witness, John Giles, by Mary Manson, the mother of the accused, and the accused himself. John Giles testified that he heard the deceased say: "I mean to kill myself before day." He definitely fixes the alleged conversation between the deceased and himself as having occurred at the home of Mary Manson, between eight and nine o'clock on Saturday night preceding the killing. Mary Manson testified that Lena White left her house *before* night Saturday, and did not return until the next morning, as far as she knew.

The accused testified that he went with Lena White, "Arkansas" High and Rube Wilson, to Portsmouth at about eight o'clock on Saturday evening preceding the morning of the homicide; that later on, about half past ten, he, Lena White, and the other two who had accompanied him, left Portsmouth in his automobile for their homes; that he got home about eleven-thirty or twelve o'clock.

If the testimony of the accused and his mother on this point is true, then the statement of Giles is conclusively shown to be false.

With this knowledge in hand the jury ignored the evidence of Giles—vouched for by the accused—as an abortive attempt to bolster up the false defense of suicide.

Then, too, the location of the wound upon the body of the deceased is a physical fact opposed to the suicide

theory.   Dr. Glover, the coroner, testified that the bullet entered under the right arm near the back, at a point on the right side of the body in the lower border of the liver, and came out on the left side at a point about two inches higher than the entrance.

While possible that the wound was self-inflicted, to the lay mind it seems a fair inference that the wound was inflicted by some one else while the victim was in a crouching position.

While the conduct of the accused in carrying Lena White to a hospital was commendable, it does not, in view of all the other circumstances of the case, raise even a presumption of innocence.   One who could kill a defenseless woman in order to collect an insurance policy, would not hesitate to perform any act whereby his crime could be hidden.

The language employed in *Dean's Case*, 32 Gratt. (73 Va.) 924, is applicable, we think, to this case:. "Where all the circumstances of time, place, motive, means, opportunity and conduct, concur in pointing out the accused as the perpetrator of the crime, it must produce a moral, if not an absolute, certainty of his guilt."

[2] There is no merit in this assignment.

The second assignment of error challenges the action of the trial court in permitting the Commonwealth to introduce in evidence the coat and empty 32-20 shell found in the home of Mary Manson.   It is the contention of the accused that these articles were not sufficiently identified, before their introduction, to connect the accused with them.

[3] The order in which evidence is introduced is a matter which rests in the sound discretion of the trial court, and the exercise of this discretion will not be interfered with, unless there has been a palpable abuse of same.   Especially is this true where proof of a crime

depends in part, or in whole, upon circumstantial evidence.

[4] It cannot be questioned that the burden rested upon the Commonwealth to connect the accused with the coat and empty shell. To sustain the contention that the Commonwealth has failed to carry this burden, *Porterfield's Case*, 91 Va. 803, 22 S. E. 352; *Litton's Case*, 101 Va. 850, 44 S. E. 923, and *McBride's Case*, 95 Va. 818, 30 S. E. 454, are relied upon. While these cases deal with questions somewhat similar to the question involved in the instant case, the facts are so dissimilar that they cannot be held to be authority for the proposition herein contended for.

An examination of the facts stated, *supra*, shows that the accused was present when the shot which killed Lena White was fired. He told the witness, Smith, that the deceased had shot herself with a 32-20 calibre pistol. The pistol was never produced. A 32-20 bullet was removed from the body of the deceased. That the accused and deceased were upon intimate terms plainly appears. The deceased occupied a room in the home of Mary Manson. That the accused had free access to the home is shown by the testimony of Wilson, who saw him enter the home carrying papers which were found in a water pitcher. The accused was arrested at the home of Mary Manson about ten a. m., on the morning of the homicide. The coat, according to the testimony of Smith "would about fit the accused."

[5] We think the facts proven and the circumstances shown sufficiently connect the accused with the coat and shell to admit of their introduction as evidence.

This view is strengthened by the fact that, though the accused testified in his own behalf, he did not deny that the coat belonged to him and made no effort to explain the presence of the shell in the coat.

[6] It is the present policy of the courts to strip a case as far as possible of technicalities and reach a just solution upon the merits; especially is this true in cases involving circumstantial evidence.

In *Widgeon* v. *Commonwealth*, 142 Va. 664, 128 S. E. 459, 460, it is said: "The modern doctrine as to the admissibility of circumstantial evidence is admirably stated by Prentis, J., in *Karnes* v. *Commonwealth*, 125 Va. 758, 99 S. E. 562, 4 A. L. R. 1509, as follows:

[7] " 'Much must be left to the discretion of the trial judge, but where the proper determination of a fact depends upon circumstantial evidence, the safe, practical rule to follow is that in no case is evidence to be excluded of facts or circumstances connected with the principal transaction, from which an inference can be reasonably drawn as to the truth of a disputed fact. (8 R. C. L., page 180.)

" 'The modern doctrine in this connection is extremely liberal in the admission of any circumstance which may throw light upon the matter being investigated, and while a single circumstance, standing alone, may appear to be entirely immaterial or irrelevant, it frequently happens that the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.' "

[8, 9] The next assignment of error rests upon the objections made by the accused to the action of the attorney for the Commonwealth. These objections are embodied in the following bill of exceptions:

"Be it remembered, that at the trial of this case, when all the evidence had been introduced, and in the closing argument of the attorney for the Commonwealth, the said attorney for the Commonwealth called to an officer of the court room and borrowed

from him a long-barreled revolver and started to demonstrate to the jury that it was impossible for the deceased to have shot herself and inflicted the wound as the doctor had described the same, and, over protest of the prisoner by his counsel, the attorney for the Commonwealth was permitted by the court to use the said revolver for the purpose aforesaid, to which action of the attorney for the Commonwealth in making the said demonstration and of the court in permitting the same to be made, the prisoner, by his counsel, excepted, there being no evidence that the revolver was the one by which deceased was shot, but there was evidence that the pistol used for the demonstration was of the same calibre, size and kind as that formerly owned by the deceased."

There is no merit in this assignment. Argument by means of illustration, such as exhibiting to the jury models, tools, weapons, implements, etc., is a matter of every day practice. 1 Bishop on Criminal Proceedings, section 965. A discretion is vested in the trial court to prevent an abuse of the use of such illustrations, and unless there has been such an abuse, this court will not interfere. *Hinton* v. *Commonwealth* (1909), 134 Ky. 511, 518, 121 S. W. 434; *Owens* v. *Commonwealth* (1900), 58 S. W. 422, 423, 22 Ky. Law Rep. 514; *Herron* v. *Commonwealth* (1901), 64 S. W. 432, 433, 23 Ky. Law Rep. 782; *State* v. *Simmons* (1908), 78 Kan. 852, 854-5; *State* v. *Aughtry* (1896), 49 S. C. 285, 291-2, 26 S. E. 619, 27 S. E. 199; *State* v. *Duncan* (1893), 116 Mo. 288, 309, 22 S. W. 699.

There seems to be a misconception upon the part of counsel as to the object of the attorney for the Commonwealth in making the demonstration. The gist of the objection is: "There being no evidence that the revolver was the one by which deceased was shot." The

attorney for the Commonwealth was not seeking to demonstrate that deceased was shot with a pistol similar to the one he was using by way of illustration, but was endeavoring to show that it was impossible for the deceased to have shot herself with a pistol of the same calibre, size and kind as the one exhibited.

The next assignment of error is to the action of the trial court in refusing the following instruction:

[10] "The court instructs the jury that upon the trial of a criminal case by a jury the law contemplates the concurrence of twelve minds in the conclusion of guilt before conviction can be had. Each individual juror must be satisfied beyond a reasonable doubt of the defendant's guilt before he can, under his oath, consent to a verdict of guilty. Each juror should feel the responsibility resting upon him as a member of the jury, and should realize that his own mind must be convinced beyond a reasonable doubt of the defendant's guilt before he can consent to a verdict of guilty. Therefore, if any individual member of the jury, after having duly considered all the evidence in this case, and after consultation with his fellow jurors, should entertain a reasonable doubt of the defendant's guilt, it is his duty not to surrender his own convictions, simply because the balance of the jury entertain different convictions."

In view of the fact that this court has held in *Sims* v. *Commonwealth*, 134 Va. 736, 115 S. E. 382, and in *Scott* v. *Commonwealth*, 143 Va. 510, 129 S. E. 360, that it was not error to refuse such an instruction, we are unable to conceive why members of the bar insist that it is error to refuse such instruction. The reasons given by Judge Burks in *Sims' Case, supra*, are so cogent that we are content to let the matter rest.

[11] It is also assigned as error that the court erred in refusing to give an instruction which reads as follows:

"The court instructs the jury that the absence of all evidence of an .inducing cause or motive to commit the crime, when the fact is in reasonable doubt as to who committed it, afford a strong presumption of innocence."

This instruction was approved in *Vaughan's Case,* 85 Va. 673, 8 S. E. 584, and the refusal of the trial court to so instruct the jury on the motion of the accused was made the basis for reversal. It states a correct principle of law, but is not applicable to the case at bar.

In the *Vaughan Case,* there was an entire absence of surrounding circumstances which afforded an inducing cause for the commission of the homicide. In the instant case, there was the evidence of an eyewitness, which pointed to the accused as the perpetrator of the crime. In addition to this, the theory of the Commonwealth, that the collection of the insurance policy constituted the motive for the killing, was a proper matter to be submitted to the jury. To give the instruction was, in effect, to tell the jury there was no evidence whatsoever of motive.

Under the circumstances of this case, we are of the opinion that the ruling of the trial court was correct. See *Belote* v. *Commonwealth,* 135 Va. 468, 115 S. E. 520; *Longley's Case,* 99 Va. 807, 37 S. E. 339; *Patterson's Case,* 139 Va. 589, 123 S. E. 657.

[12] The last assignment of error is based upon the action of the court in amending instruction No. 1, given at the instance of the accused. This instruction reads as follows:

"The jury are instructed that circumstantial evi-

dence, *as well as all evidence*, must always be scanned with great caution, and will never justify a verdict of guilt, especially of an offense, the penalty of which may be death, unless the circumstances proven are of such a character and tendency as to produce on a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt, and unless the jury believe from the evidence that each and every circumstance essential to conviction of the accused had been made out and established beyond a reasonable doubt, then the accused should be acquitted."

The words italicized constitute the amendment made by the trial court.

We seriously doubt whether or not the instruction, either as offered or as amended, should have been given the jury. In any event, we are unable to perceive any error in the court telling the jury to scan all the evidence with great caution and refuse to bring in a verdict of guilty unless they are satisfied beyond a reasonable doubt of the truth of the charge.

There is no merit in this assignment.

We find no error in the judgment of the trial court and it is affirmed.

*Affirmed.*